**SIGNED THIS: November 17, 2022**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    21-70207 |
| ROBERT SCOTT SCHERTZ, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| JEANA K. REINBOLD, solely as | ) | |
| Chapter 7 Trustee, not individually, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No.    21-07017 |
| | ) | |
| KIMBERLY D. SCHERTZ, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court after trial is a complaint filed by the Chapter 7 trustee of the bankruptcy estate of Robert Scott Schertz seeking authority to sell real estate co-owned by the bankruptcy estate and Kimberly D. Schertz as tenants

by the entirety. For the reasons set forth herein, judgment will be entered in favor of the Trustee.

## I.    Factual and Procedural Background

Robert Scott Schertz ("Debtor") filed a voluntary petition under Chapter 13 of the Bankruptcy Code in the District of Utah on January 4, 2021. Shortly thereafter, the Debtor filed a notice of voluntary conversion to Chapter 7, and Kimberly Schertz filed a motion for relief from the automatic stay seeking to be allowed to proceed with a dissolution of marriage case she had filed in McLean County, Illinois, on December 9, 2020. Mrs. Schertz asked to be allowed to have the Illinois state court divide the couple's property and debts and to resolve other related disputes; the Debtor objected to the motion.

On March 17, 2021, after two hearings on the motion, the Utah bankruptcy court entered an order granting limited relief to allow the Illinois state court to "identify, value, apportion, divide and allocate the parties' marital property[.]" The order did not, however, provide stay relief for the allocation of the parties' debts and explicitly stated that the state court's "determination as to the allocation and division of the parties' marital property shall not be binding on the Bankruptcy Court, the creditors, or the Chapter 7 Trustee in this case until and unless the Bankruptcy Court has a further hearing and order approving the allocation of property of the bankruptcy estate[.]" The same day, the Utah bankruptcy court entered an order granting a motion to transfer venue of the case to the Central District of Illinois. The transfer motion had

been filed by Compeer Financial, PCA ("Compeer"), a creditor of the Debtor, Kim Schertz, and the related entity, Schertz Aerial Service, Inc. ("Schertz Aerial"). The transferred case was docketed in this District on March 22, 2021.

After the case was transferred, Jeana K. Reinbold was appointed as the Chapter 7 trustee ("Trustee"). The Trustee commenced administration of the estate. She sold the Debtor's stock in Schertz Aerial—of which the Debtor was the sole shareholder—along with related causes of action to Kim Schertz for $20,000. The Trustee also commenced this adversary proceeding against Kim Schertz by filing a complaint to compel the sale of real estate consisting of a single-family home on 11 acres and an additional 52 acres located at 22761 N. 1300 East Road, Hudson, Illinois 61748 ("Hudson property"), co-owned by the estate and Kim Schertz as tenants by the entirety.

Prosecution of the Trustee's adversary complaint was postponed for some time out of deference to the state court in its consideration of marital dissolution matters. But after it became clear that there was no end in sight to the dissolution case and because Compeer recorded a $2 million judgment against Kim Schertz that encumbered her interest in the Hudson property, this Court entered an order in the main bankruptcy case on August 3, 2022, reconsidering the original order granting stay relief. The order vacated the stay relief order only as to the Hudson property. After this Court's determination that the issues concerning the real estate were best resolved through the

bankruptcy case and proceedings, the Trustee's complaint was scheduled for trial for September 28, 2022.[1]

The Trustee's case in chief at trial consisted of five witnesses. Faiq Mihlar and Jennifer Dixon were called to testify as to the public records regarding title and ownership of the Hudson property. Mr. Mihlar identified himself as a managing member of the law firm Heavner, Beyers & Mihlar, which he said also owns and operates Central Illinois Title Company. He said that, in June 2022, Central Illinois Title Company received a request for a title search on behalf of Compeer as to the Hudson property. Mr. Mihlar stated that the company completed the search as requested, which showed the property was owned by the Debtor and Kim Schertz as tenants by the entirety. In September 2022, an updated, supplemental report was completed at the request of the Trustee.

Mr. Mihlar explained that the property was previously owned solely by the Debtor until June 29, 2020, when ownership was transferred by deed to the Debtor and Kim Schertz as tenants by the entirety. According to Mr. Mihlar, ownership of the property has not changed since that transfer. Jennifer Dixon identified herself as a manager of Central Illinois Title Company and testified that she was familiar with the title searches and reports that Mr. Mihlar referenced in his testimony. She further testified that she had

---

[1] Kim Schertz's appeal from the Court's order entered August 3, 2022, is pending. This Court denied her request to stay the order pending the appeal based in part on the fact that she had subsequently sought and obtained an order vacating the original stay relief order in its entirety. Further, this Court's jurisdiction to hear the Trustee's complaint was not contingent on the August 3 order as this Court had never abstained from hearing matters related to property of the estate. Kim Schertz did not seek a stay pending appeal in the district court.

performed an online search of the McLean County Recorder's Office website the day before trial to confirm the continuing accuracy of the reports issued by Central Illinois Title Company and found no new recordings.

Next, the Trustee called Noelle Burns to testify. Ms. Burns identified herself as a realtor and an owner of RE/MAX Rising. She testified that she has been a realtor for 22 years, working for Coldwell Banker prior to her association with RE/MAX. Ms. Burns was familiar with the Hudson property, having visited and conducted a market analysis of the property in fall 2021. She said she did not personally inspect the acreage but did walk through the residence on the property, describing it as a great house admittedly in need of some updating. Ms. Burns identified a report that she prepared following her visit that included her opinion as to the value of the property. As to the process for completing her report, Ms. Burns explained that, following a site visit, she searches the multiple listing service system for "comps"—recently sold, pending, or currently active property listings comparable to the subject property. She said that adjustments can be and often are made when conducting a market analysis to account for differences in the properties being compared. Following this process, Ms. Burns concluded that the value of the Hudson property at the time of her report was approximately $736,000.

Ms. Burns also identified an updated report for the Hudson property that she generated the week before trial. She explained that the real estate market in the area had improved and that pending sales of some of the comps she relied on in her first report had since closed, providing more accurate

comparison data. Ultimately, Ms. Burns concluded that $11,000 per acre was the average price for farmland in the area and that $275,000 for the house and 11 acres upon which it sits was a fair estimation of value—up from the $250,000 at which she initially valued the residence. Based on those figures, Ms. Burns concluded that the entire property—the house and all 63 acres— was worth approximately $829,000 as of the week before trial.

Ms. Burns said she considered her opinion to be a conservative estimate, that a price per acre of $11,000 was a base amount with room for upward adjustment, and that she felt confident the Hudson property would appraise for at least $829,000. She did acknowledge, however, that most of the Hudson property's value came from the farmland and that she did not take any steps to determine the specific value of that acreage other than looking at the per acre prices of her selected comps. On cross examination, she admitted that the listing details for one of the comps she used included a note about the high quality of its soil per testing and that no such testing had been conducted to establish the quality of soil on the Hudson property.

Kevin Buente, a representative of Compeer, also testified. He described his 27-year career with Compeer, first as a credit analyst and currently as principal credit officer. He said he is familiar with the Debtor and Kim Schertz through a series of loan transactions with Compeer on behalf of themselves and Schertz Aerial. Mr. Buente was assigned to the Schertz account in October 2020 but had helped his predecessor before taking over as the account officer. Mr. Buente also said he was familiar with the claim filed on behalf of Compeer

in the Debtor's bankruptcy case, confirming that the $3,511,322 debt asserted was based on information provided by Compeer to its attorney and was accurate as to the amount owed at the time of filing. He acknowledged that the debt had been paid down some since the claim was filed and stated that the balance owed at the time of trial was approximately $2.596 million.

Mr. Buente identified a standstill/forbearance agreement entered into in June 2020 between Compeer, Schertz Aerial, and the Debtor and Kim Schertz individually. According to him, the purpose of the agreement was to give the borrowers time to sell assets to satisfy or otherwise pay down the debt owed to Compeer. Mr. Buente asserted that no further agreements had been entered into by the parties, but he also did not foreclose the possibility of a further agreement being reached in the future.

Mr. Buente also identified a judgment entered by the Circuit Court of McLean County, Illinois, on December 7, 2021, in favor of Compeer and against Kim Schertz. Because the outstanding balance owed on the Schertz Aerial loans exceeded the value of collateral securing the debt, Mr. Buente said that Compeer engaged its attorney to pursue Mrs. Schertz for the balance. To that end, he also identified a memorandum of judgment against Kim Schertz in the amount of $2,675,112.44 plus costs that Compeer's attorney recorded with the McLean County Recorder's Office on January 9, 2022. Again, notwithstanding a few small payments made recently on the debt, Mr. Buente asserted that a balance of at least $2,500,000 remained due.

The Debtor, Robert Scott Schertz, was called as a witness for both parties, testifying first in the Trustee's case in chief.[2] The Debtor acquired Schertz Aerial in 1986 and was the company's sole director, officer, and shareholder for many years. Both Kim Schertz and the Debtor's mother served as secretary at different times while the Debtor served as president and treasurer. But when his mother resigned from her position in 2014, the Debtor became secretary in addition to his roles as president and treasurer until he and Kim Schertz's son Brian Schertz became president in July 2020. The Debtor then became vice president and a co-director with Kim.

Prior to that, in 2019, the Debtor secured outside employment working for ExpressJet Airlines. He agreed that he was frequently away from the business but said he remained in constant communication with and deeply involved in the operations of Schertz Aerial. He noted that his son who succeeded him as president of Schertz Aerial maintained full-time employment outside the business during his tenure as well. The Debtor acknowledged that his involvement in Schertz Aerial began to wane in 2020 while he was away working in other states—first with Sky Farmer Ag Service in North Dakota and later with the USDA in Utah. But he asserted that he remained involved in certain aspects of Schertz Aerial that only he could do or approve.

The Debtor testified that, in November 2020, relations had soured between himself and the other family members managing Schertz Aerial to the point that he exercised his power as sole shareholder to fire Kim and Brian

---

[2] Portions of the Debtor's testimony given as an adverse witness in Kim Schertz's case and in the Trustee's case in rebuttal have been combined with the recitation of his testimony in the Trustee's case.

Schertz. In December 2020, Kim Schertz filed her petition for dissolution of marriage that is now pending; the Debtor filed his bankruptcy petition in Utah a few weeks later. His interest in Schertz Aerial along with his claims against the company were sold to Kim Schertz for $20,000 by the Trustee in October 2021.

The Debtor testified that he bought the Hudson property in 1989 and built the house that he and Mrs. Schertz moved into in 1992. He maintained his residence there until shortly before his separation from the company and eventual bankruptcy filing. As the owner and long-time resident, the Debtor said he was very familiar with the property. In his time there, he said he farmed the ground, hunted, and made various improvements to the property. In building the house, the Debtor said he ran power for a half of a mile underground to the house site, had a septic system put in, and installed drainage tiles. Later improvements included installation of a new roof, interior carpeting, some kitchen upgrades, and the construction of what the Debtor described as a heated shed measuring 40 feet long and wide with running water and a concrete foundation. He also said that, over time, he and the couple's son Michael Schertz erected six or eight deer blinds on the property. The Debtor said he and Mrs. Schertz had invested a lot of money and sweat equity in the Hudson property over the years. Asked about the circumstances of the transfer of ownership of the Hudson property from his sole ownership to joint ownership with Kim Schertz as tenants by the entirety, the Debtor asserted that the transfer of title was done, at the suggestion of his attorney, as

part of negotiations to get Mrs. Schertz to withdraw a petition for dissolution of marriage in 2018. The Debtor said he received no other consideration for the transfer.

The Debtor said that he had become intimately familiar with the Hudson property over the 30 years he lived there. He said that he personally planted, sprayed, and worked the ground, but he did not have a combine so he paid others to harvest the crops. In recent years, he rented the land to others to farm. That experience, as well as his experience as an agricultural pilot flying over millions of acres of farmland in the region through which he saw first-hand the impacts of different soil types on crop yields, led the Debtor to form an opinion about the Hudson property acreage and its value for agricultural uses. He described the farmland as "variable"—in some areas the soil is excellent but in other areas it is subpar. He acknowledged that there are drainage issues and that the light soil makes it more challenging to grow anything other than cover crops. He said that, overall, the land's agricultural value is marginal. But he also said the property is very unique due to it being surrounded on three sides by parkland and a watershed protection area managed by the City of Bloomington, Illinois; the property is insulated from development. He explained that building is greatly restricted in the Evergreen Lake area that borders the property, resulting in the Hudson property serving as a transition area for deer and therefore being excellent hunting ground.

The Debtor acknowledged Ms. Burns' testimony as to the Hudson property's value but said he disagreed with her opinions. Based on his time

living in the community over the years during which he witnessed one individual buying up land in the area at a premium, the Debtor said that, in his opinion, the house and surrounding acreage is worth $300,000 and the farmland is worth between $15,000 and $20,000 per acre.

At the conclusion of the Trustee's case in chief, Kim Schertz moved for a directed finding that the Trustee had not established the necessary elements of her cause of action. The Trustee countered that Mrs. Schertz had stipulated to two of the four required elements of proof in the parties' pretrial statement filed in October 2021. Kim Schertz's attorney admitted that he had stipulated that partition of the property was not practicable and that sale of the estate's interest alone would bring significantly less than a sale of the whole. This Court found that the third element requiring that the benefit to the estate of a sale free and clear of the co-owner's interest outweigh any detriment to such co-owner did not place a burden on the Trustee to prove the lack of any potential harm to Kim Schertz. The Trustee had provided evidence of substantial benefit to the estate through the sale of the property that would yield significant proceeds for distribution to creditors. Because Mrs. Schertz had not yet presented her defense, including any evidence tending to establish detriment to her, there was nothing for the Trustee to rebut. The Court also noted that the fourth element—that the property was not used in the production or sale of electric energy or natural or synthetic gas—had also been stipulated to and was inapplicable to the case. The motion for a directed

finding was therefore denied and Mrs. Schertz proceeded to present her defense.

Mrs. Schertz's defense at trial was based on her claim that she reasonably expected to be awarded 100% of the Hudson property in her pending dissolution of marriage case. That defense was never raised in any pleadings or documents filed in this proceeding but was repeatedly mentioned at pretrial hearings. The bulk of her proffered testimony related to the marital estate's composition and potential allocation under state law. In addition to the Debtor, Mrs. Schertz relied on the testimony of two other witnesses: herself and a certified public accountant ("CPA").

Nicole Allen was the first to testify. Ms. Allen identified herself as a CPA and manager at Insight CPAs and Financial, LLC. Her work covers a variety of areas, including completing individual and business tax returns, bookkeeping, business consulting, and litigation support. Ms. Allen has worked in the accounting field for twelve years, holds a CPA licensure in the State of Illinois, and is a nationally accredited and certified valuation analyst.

Ms. Allen became involved in this matter when Kim Schertz consulted her in early 2021 regarding litigation support and the Debtor's bankruptcy filing. As part of her engagement, Ms. Allen said she reviewed the couple's individual and business tax returns for prior years going back as far as 2016 or 2017, as well as the company's QuickBooks files. She identified a report dated February 23, 2022, that she had created regarding a net operating loss ("NOL") of Schertz Aerial. She explained that, in tax terminology, an NOL refers to

losses from a business that are too large to be offset by the business's income but can be carried forward to offset future earnings in later years. Ms. Allen said that, when an S-corporation such as Schertz Aerial has a loss, it flows through to the individual owner's tax returns and can be used to offset the individual's income. If there is still excess loss after offsetting such income, the NOL is carried forward to the next tax year.

Ms. Allen discussed the NOL generated by Schertz Aerial when it was owned by the Debtor. Due to Schertz Aerial's status as an S-corporation, the NOL belonged the Debtor and followed him when his stock was sold to Kim Schertz. The NOL is therefore available only to him to be used against his future income. If the Debtor and Kim Schertz were to file joint tax returns, however, the NOL could be applied to also offset income of Kim Schertz. Ms. Allen was aware of the pending dissolution of marriage case between the Debtor and Kim Schertz. She said that the dissolution would not change the fact that the NOL belongs to the Debtor and, because he and Kim Schertz would no longer file joint tax returns after finalization of the dissolution, the tax benefit would only be available to him. The NOL is not transferable.

According to her report on the issue, Ms. Allen determined that the Debtor had losses available to carry over from 2020 for a total NOL of $4,224,738. Asked how he would receive the benefit from that loss carryover, Ms. Allen said the Debtor could apply the NOL against whatever income he has from whatever source to reduce his tax liability in future years. If he does not have income in a year or generates income insufficient to exhaust the NOL, it

will continue to carry over until he has income to apply against it. In her report, Ms. Allen evaluated the potential federal tax benefit of the NOL over time. Acknowledging that the tax benefit to the Debtor would depend on his level of income, she opined that, based on current tax rates, the NOL could yield future tax savings between $422,473 and $1,563,153. To illustrate how that would work, Ms. Allen explained that, if the Debtor had income of $100,000 in a year, applying the NOL would result in tax savings—and potentially a tax refund, depending on his withholding—of $13,117 for that year. If he had more income to be offset by the NOL, the tax savings would correspondingly increase. On cross examination, Ms. Allen agreed that the amount of the benefit to be gained from the NOL is variable and entirely dependent on the Debtor's year-to-year income—if he did not have income, the NOL would provide no benefit.

Ms. Allen identified the 2019 and 2020 joint tax returns for the Debtor and Kim Schertz, which she said she reviewed and relied on in creating her report. She agreed that those returns reflected income from the Debtor's wages and interest from Schertz Aerial in 2019 totaling $163,063 and wage income for the Debtor in 2020 of $79,222. But Ms. Allen clarified that income is not limited to wages and noted, by way of example, that both returns showed income from IRA distributions.[3] In both years, the NOL was used to offset reported income. According to the tax returns, the amounts of the NOL used in

---

[3] On redirect examination, Ms. Allen agreed that the NOL could also be used to offset Social Security income but, upon further inquiry from the Court, acknowledged that it would apply only to the extent such income was taxable, if at all.

2019 and 2020 were $13,544 and $315,600, respectively. The tax returns also showed refunds of $26,513 in 2019 and $7627 in 2020. As far as the Debtor's income and tax circumstances since 2020, Ms. Allen said she did not have knowledge other than what could be gleaned from the records of Schertz Aerial.

After both parties concluded their examination of Ms. Allen, the Court sought to clarify her testimony as to her determination of the expected benefit of the NOL to the Debtor. Ms. Allen agreed that the opinion in her report of an expected benefit of the NOL ranging between $422,473 and $1,563,153 was a generic calculation, not based on any personalized assumptions specific to someone similarly situated to the Debtor. She agreed that, had she been asked to make a more personalized determination of the benefit of the NOL to the Debtor, such a calculation would have been based on facts or assumptions about the Debtor's age, health, current and future job prospects, and other factors. Ms. Allen agreed that if she had been provided the necessary additional information, she could have made the calculation. She acknowledged that, under the hypothetical she provided whereby yearly income of $100,000 would create a tax benefit of roughly $13,000 per year, it would take more than 30 years to fully realize even the low-end potential total benefit of $422,473. Ms. Allen conceded that, for the Debtor to realize the threshold value calculated in her report any sooner, he would need to generate substantially more than $100,000 a year in taxable income. She further acknowledged that, when trying to determine the present value of the expected long-term benefit of the NOL, a discount rate for the time value of money would need to be determined

and applied to calculate the present-day value of that future benefit. Again, Ms. Allen represented that she has the expertise to make those calculations had she been asked to do so.

Mrs. Schertz next recalled the Debtor to testify. The questioning of the Debtor by Kim Schertz's attorney focused on his personal finances and employment and his alleged dissipation of marital assets in recent years. He also was questioned about the assets of the marital estate.

The Debtor acknowledged having an interest in several vehicles and financial accounts. He admitted that he is the owner of an unencumbered 2014 Jeep Compass but disagreed with the suggestion by Mrs. Schertz's attorney that it is worth $11,000; he described its condition as average and estimated that it is worth closer to $7000. In addition to the Jeep Compass, the Debtor mentioned a 2001 Mercury Grand Marquis and a 2003 Mercury Marauder, both of which he considers to be marital property. He also described a 1968 Ford Mustang that was gifted to Kim Schertz early in their marriage but later titled in both of their names; he claimed to have spent roughly $70,000 to repair and maintain the Mustang over the years. He also noted ownership of a John Deere tractor with an estimated fair market value of $17,000.

He acknowledged several personal bank accounts, most of which were closed or inactive and of nominal value; most recently, he said, he primarily uses his checking account with Happy State Bank into which his wages are deposited. The Debtor also has a health savings account with Bank of America that, at the time of his bankruptcy filing, carried a balance of more than

$20,000. At various times, he also had IRAs with Merrill Lynch, Principal Bank, and other institutions that he said he since consolidated into an IRA with Edward Jones, where his current employer also holds a Simple IRA for his benefit. The Debtor agreed that the value of those accounts is around $12,000. He is also the holder of roughly 1.7 million airline miles that he asserted have no meaningful value; to the contrary, he said that there would be a cost to use the miles. The Debtor did not dispute that he was the holder of life insurance policies—an AIG policy that was worthless due to nonpayment of premiums and a Country Life policy worth about $18,000 subject to $14,000 in loans he had taken against it to fund his legal expenses and a move to Texas.

The Debtor testified that he is currently employed as chief pilot for Jack Oldham Oil Inc., in Dumas, Texas, where he has worked since May 2022. It is one of several jobs he has held since leaving Schertz Aerial. The Debtor worked for the USDA in Utah as a flight training officer from late 2020 to early 2021 before being terminated from the position. He acknowledged earning $10,838.88 from his employment with the USDA in 2021. During the 2021 farming season, the Debtor was an agricultural pilot in Great Bend, Kansas, for Tony's Aerial Spraying Inc., where he said he was compensated on a "percentage of gross" with no benefits. That resulted in $136,840.70 in income in 2021, but the Debtor said that the job was seasonal in nature and he had no expectation that he would be retained for future seasons. After the 2021 farming season in Kansas, the Debtor drove a truck hauling fertilizer and propane for Mid Continent Transportation, Inc., where he earned $2020.40

through the end of 2021. The Debtor also acknowledged rental income of $10,200 under a contract with Larry Troyer to farm the Hudson property in 2021, of which he said his half went to the Trustee, as well as modest distributions from an ExpressJet Airlines 401(k) savings plan. The Debtor did not dispute that, in total, his tax forms showed 2021 gross income in excess of $162,000, but he said that the figure was not final or comprehensive of his income picture because it did not account for losses from Schertz Aerial that might be available to offset his income. The Debtor also admitted that, through August 2022, he had earned gross wages of $65,000 and that he was still working and anticipated earning more wages through the end of the year.

At 61 years old, the Debtor estimated he would work another four to ten years before retiring. He admitted that he expects to earn at least $150,000 in 2022 but was unsure about his ability to meet the physical demands and other requirements of his current employment in the long term based on his age and family medical history. The Debtor anticipates living on Social Security benefits in retirement but does not expect that his remaining IRAs will yield much retirement income. At this time, he is mostly debt-free, having been granted his discharge in the bankruptcy case.

The Debtor was also questioned extensively about a series of transfers from the various investment accounts held in his name or the name of Schertz Aerial but under his control. The Debtor did not dispute the occurrence of the transfers or that the accounts were under his sole control when the transfers

were made. Rather, his testimony was that the vast majority of transfers were made exclusively to or for the benefit of Schertz Aerial.

The first two transfers at issue were made from an Edward Jones account held in the name of Schertz Aerial. According to the Debtor, he caused a direct transfer of $75,000 to be made to Schertz Aerial in August 2017 as part of a normal transfer between business accounts—the account statement reflects as much. He said that the transaction was tied to the inheritance he received from his mother and, in turn, invested into Schertz Aerial. In January 2018, the account was closed after the remaining assets—including 2300 shares of Microsoft and $13,835 in cash—were transferred to a Merrill Lynch account. According to the Debtor, the Merrill Lynch account into which the assets were transferred was held in the name of Schertz Aerial. But he admitted that he had no records for that account that was under his exclusive control at the time. Rather, he said the account was closed per control agreements with Compeer, and any record of the transaction would be in the possession of Compeer or Schertz Aerial.

The other transfers questioned by Kim Schertz were from Merrill Lynch individual accounts of the Debtor. In February 2018, the Debtor transferred $55,193 worth of Oracle stock from his Merrill Lynch IRA. He said it was transferred to his Edward Jones Roth IRA under the advice of his financial advisor and that he provided the records for that account in state court discovery. On September 24, 2018, the Debtor transferred another $100,000 from the account that apparently went to Schertz Aerial as part of various

personal loans that he and Kim Schertz made to the company to cover operating expenses of Schertz Aerial and to pay Compeer. Again, the Debtor did not have documentation to support his assertion but said that the corporate records, which he no longer has access to, should evidence as much. In April 2019, the Debtor made two $25,000 transfers from his individual Merrill Lynch account, which he again said went to Schertz Aerial and should be reflected in the company's records as a loan from the Debtor. In May 2019, he transferred another $55,000 from his Merrill Lynch account. He said the transaction was required pursuant to the conditions of control agreements entered into with Compeer. According to the Debtor, the money went to a PNC account and, other than a small portion being used to pay some ordinary household expenses like real estate taxes and insurance, was used for company purposes.

Finally, the Debtor caused two more transfers from his Merrill Lynch IRA in 2020. In May 2020, he withdrew $25,000 that he said was loaned to Schertz Aerial to cover insurance costs. Another $50,000 was withdrawn from the Debtor's Merrill Lynch IRA in August 2020, which he said he used to pay an outstanding bill to Schertz Aerial from Van Diest Chemical Company. As with the other transfers, the Debtor said he did not have documentation of where the funds went but, again, believed the company's records would confirm his testimony. Unlike the other transfers, the Debtor said that the 2020 transfers from his Merrill Lynch IRA were specifically discussed with both Kim and Brian Schertz. According to him, Kim not only knew of both 2020 transfers but demanded that the Debtor make them.

In all, the Debtor's testimony was that the hundreds of thousands of dollars in transfers from investment accounts since 2017 was used almost exclusively for the benefit of Schertz Aerial. He acknowledged that many of the transfers were made as loans to the company but also said that he no longer had any interest in those debts based on his interest in and claims against Schertz Aerial having been sold to Kim Schertz through his bankruptcy case. The Debtor said that he still holds a claim against the company for unpaid wages. During his tenure with exclusive control over the business, the Debtor said he was fully committed to Schertz Aerial, devoting both his time and money to its success.

Finally, Kim Schertz testified on her own behalf. She said she has been married to the Debtor for 39 years and has lived on the Hudson property for the last 30 years. For much of her marriage, Mrs. Schertz primarily took care of the house and children but also helped with Schertz Aerial. According to her, the Debtor was gone significant amounts of time during the last 10 to 15 years of their marriage. She never held any outside employment and agreed that the Debtor was the primary wage earner throughout the marriage. Mrs. Schertz acknowledged purchasing her husband's interest in Schertz Aerial through his bankruptcy case and that she now owns the company but said she still does not collect wages. According to Mrs. Schertz, her income consists entirely of temporary maintenance payments from the Debtor of $1000 a month plus 30% of what the Debtor makes beyond a certain amount, as well as state health and SNAP benefits. She also acknowledged rental income from the farmland under

contract with Larry Troyer, which she said she segregated into an Edward Jones account used for joint expenses pending the couple's dissolution.

As Mrs. Schertz understands it, allocation of her and the Debtor's marital estate is controlled by the equities of the situation. In her view, the Debtor wrongfully dissipated marital assets and mismanaged Schertz Aerial as part of a ploy to shrink the value of the marital estate to her detriment. In her estimation, the only way to offset what she sees as a windfall to the Debtor from his NOL and various IRA withdrawals is to allocate the Hudson property— and basically everything else—entirely to her, thereby defeating any claimed benefit to the Debtor's bankruptcy estate from the sale of the Hudson property. To that end, Mrs. Schertz testified as to the value and composition of specific components of the marital estate.[4]

Beginning with the Hudson property, Mrs. Schertz disagreed with both the Debtor and Ms. Burns' valuations of the property. She challenged the Debtor's credibility on the subject, claiming that he personally farmed the land only one time in the past 30 years—most of the time it was subcontracted to farmers like Larry Troyer. She also downplayed the value of the land for hunting, stating that the deer blinds built by the Debtor were unsafe and in disrepair. As for the condition of the house itself, Mrs. Schertz said everything was dated and that there are material defects from the installation and construction of various items. For instance, she said field tiles were not

---

[4] Mrs. Schertz presented her Exhibit 1 that consisted of a listing of all assets she claimed were owned by her, the Debtor, or both of them. On Exhibit 1, she allocated the listed marital property to herself or the Debtor and claimed certain items to be nonmarital. Attached to the listing were bank statements and other documents that she claimed supported the valuations listed. She referred to Exhibit 1 repeatedly during her testimony.

properly installed when the shed was built, drywall in the house was not installed correctly and needs to be replaced, and there are issues with mold in the basement. According to Mrs. Schertz, she outlined those and other issues for Ms. Burns the one time she visited the property in late 2021; Mrs. Schertz said Ms. Burns created her updated report in 2022 without inspecting the property again or reaching out about any change in condition since her visit. Mrs. Schertz disputed Ms. Burns' initial valuation of the Hudson property, but she did not provide a competing appraisal or valuation and admittedly relied on Ms. Burns' 2021 valuation of $736,000 in her proposed allocation.

Mrs. Schertz also downplayed the value of the couple's personal property. She said the Mercury Grand Marquis and Mercury Marauder, both in her possession and proposed to be allocated to her, were worth no more than $6000 combined. She admittedly did not know what the John Deere tractor is worth—it was not even listed on her allocation proposal—but she said that she had expended $12,000 in recent years just to keep it running. Mrs. Schertz acknowledged holding an account at Marine Bank dedicated solely to maintenance payments with a recent balance of close to $6000. She also identified two Edward Jones accounts in her name: a single account with a balance of a few hundred dollars and a Roth IRA with a balance of $284,759 as of June 2022.

On cross examination, Mrs. Schertz identified the Edward Jones single account in her name with a balance of a few hundred dollars as the segregated account into which she deposited marital funds and that she used to pay joint

expenses. In addition to her half of the 2021 rent check from Larry Troyer, she agreed that she had deposited into the account another $7000 check from Larry Troyer representing the first half of the rental contract amount for 2022, the couple's $27,000 joint tax refund from 2019, and more. She conceded that those funds were no longer in the account, asserting that she had used the money to fix the tractor and pay other maintenance costs for the Hudson property that exceeded her monthly income. She also volunteered that she used the account funds to pay $4000 in attorneys' fees each month.

As for Schertz Aerial, Mrs. Schertz listed the asset as having a negative value and referred to a purported company balance sheet as her source for the valuation. Unable to establish any foundation for her assertion, however, she ultimately conceded under questioning by her own attorney, that she did not know how to quantify the fair market value of the business. According to Mrs. Schertz, the company was essentially "bankrupt" in late 2019; she said the Debtor used personal assets to make several loans to Schertz Aerial and ran up the company debts in 2017 and 2018 before offering the company up to Compeer to satisfy outstanding obligations. Mrs. Schertz said she stepped in to restore operations, repay debts, and move the business forward after the Debtor abandoned the company. She ultimately bought out the Debtor's interest and sought to reorganize the business through its own bankruptcy

filing.[5] Although she was vague on the details, she said that she believes Schertz Aerial is now operating in the positive.

Mrs. Schertz acknowledged that Compeer and the Small Business Administration ("SBA") are Schertz Aerial's major creditors and that a significant portion of the company's debts are owed to Compeer. She also admitted that she and the Debtor are personally liable on the remaining Compeer debt because they signed the notes and other loan documents as co-borrowers, although she also claimed to have done so under duress. She also acknowledged signing the standstill agreements with Compeer, which she denied ever defaulting on and accused Compeer of not following through on a previous offer to refinance the debts when she took over the company. Other than her personal liability on the Compeer notes, Mrs. Schertz has very little personal debt. She conceded that, absent selling the Hudson property and depleting retirement accounts, she has no other way of personally satisfying the Compeer debt. But she also asserted that, in addition to leaving her homeless, selling the Hudson property would adversely impact the operations of Schertz Aerial and deprive her of much needed income sources. She said she would not have the ability to acquire other property in the future. And, at 61 years of age, with bad knees, no job history, and a 40-year-old English degree, Mrs. Schertz opined that securing employment would be quite difficult.

Prior to gaining control of Schertz Aerial and its assets through the October 2021 purchase of the company stock, Mrs. Schertz said she had no

---

[5] Schertz Aerial filed a Chapter 11 Subchapter V case on March 16, 2022, in the Central District of Illinois that was assigned case number 22-70128. The case remains open with confirmation of a Second Amended Plan pending.

control over how company funds were used or where they were distributed. She agreed that the Debtor was the brains and know-how in charge of the business while it was under his control. Still, she accused the Debtor of running up company debt for the purpose of creating the NOL for his sole benefit and her detriment and moving assets to avoid Compeer. Asked to elaborate, Mrs. Schertz admitted that she did not have specific knowledge but offered that she initially filed a petition for marital dissolution in 2018 after she found out that the Debtor had purchased his sister's interest in a house inherited from their late mother without discussing it with her and apparently hiding it from Compeer as well. On cross examination, she admitted that she was aware of the Debtor's inheritance from his late mother but disagreed with the suggestion that he put that inheritance into Schertz Aerial. For reasons she did not explain, she viewed his contribution of inherited funds into Schertz Aerial as an attempt to convert Schertz Aerial from marital to nonmarital property. But she acknowledged that, whatever the intent, the end result was that the Debtor's inheritance became part of Schertz Aerial.

Mrs. Schertz also said she had no knowledge of the transfers and withdrawals from the Debtor's investment accounts in 2017, 2018, or 2019 before she took over the company. She did admit, however, that she was aware of the 2020 transfers. She agreed the May 2020 withdrawal of $25,000 went toward insurance for Schertz Aerial but said that it was used to replace federal payroll protection payment loan funds that she said the Debtor improperly used to pay insurance premiums. As for the August 2020 transaction, she

acknowledged there were cashflow problems at Schertz Aerial and did not dispute that the $50,000 was used to pay for chemicals or otherwise remedy cashflow problems of the business. Asked about whether she knew the Debtor to ever use company assets for personal use, Mrs. Schertz cited his personal use of the company truck and cell phone, and his charging of interest on personal loans he made to the business. Ultimately, however, she said that she simply has no knowledge of how or for what the other withdrawals and transfers from the various investment accounts were used.

On rebuttal, the Debtor took issue with Kim Schertz's testimony that she signed promissory notes under duress. He said she signed on originally in 2015 when business was doing great, and the reality was that, having done so, she was on the hook for future notes. The Debtor also sought to clarify the circumstances of his inheritance. He said his mother passed away in February 2017. He and his sister inherited a number of assets that included investment accounts, some real property, his mother's interest in Schertz Agricultural Service—a separate and distinct entity from Schertz Aerial at the time—and other mementos. The Debtor explained that he inherited the business and the real estate that came with it and a minority share of their childhood home. His sister received the majority interest in the childhood home, and the investment accounts and other cash and securities were split between the two siblings. The Debtor further explained that Schertz Agricultural and his share of investment accounts and other securities were merged into Schertz Aerial to make it stronger. He said he ended up buying out his sister's share of the

house and intended to keep it before selling the property in 2019 "when all this blew up." He reiterated that much of the inheritance was put into Schertz Aerial, first through the merger of Schertz Agricultural and then by his contribution of the inherited IRAs over time. He explained that he depleted the inherited IRAs before other accounts because he knew they would not be protected in the event of bankruptcy. The Debtor said he had plans to expand the business with the cash influx, but it did not go very far.

At the conclusion of the trial, the Trustee and the attorneys for Kim Schertz presented arguments. The matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters concerning the administration of the estate, the sale and distribution of estate property, and other proceedings affecting the liquidation of the assets of the estate are core proceedings. 28 U.S.C. §157(b)(2)(A), (N), (O). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III.    Legal Analysis

The Trustee filed this adversary proceeding to obtain authority to sell the interest not only of the estate but also of the co-owner, Kim Schertz, in the Hudson property.  She relies on §363(h), which provides in relevant part:

> (h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> > (1) partition in kind of such property among the estate and such co-owners is impracticable;
> >
> > (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
> >
> > (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
> >
> > (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. §363(h).

The burden of proof under §363(h) rests with the Trustee. *Chatz v. Alice Rhoads Living Trust (In re Rhoads)*, 572 B.R. 905, 912 (Bankr. N.D. Ill. 2017) (citation omitted). But "once the Trustee establishes a *prima facie* case that the estate would benefit from the [proposed] sale . . . the burden shifts to the [d]efendants to show why the court should not approve the sale." *Id.*

*A. The Trustee's Case*

The Trustee established that the Hudson property is owned by the Debtor and Mrs. Schertz as tenants by the entirety. Property rights are created and defined by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). In Illinois, property "held in tenancy by the entirety shall not be liable to be sold upon judgment entered . . . against only one of the tenants[.]" 735 ILCS 5/12-112. In other words, property held in tenancy by the entirety under Illinois law is generally protected from sale to satisfy the debt of only one spouse. *In re Tolson*, 338 B.R. 359, 370 (Bankr. C.D. Ill. 2005) (citations omitted). "To enforce a joint debt, however, the property may be sold the same as if title was held in joint tenancy." *Id.* Here, the parties agree that the Debtor and Kim Schertz owe a joint debt to Compeer. They both signed the loan documents with Compeer as co-borrowers, and Compeer has since obtained a judgment and recorded a lien against Kim Schertz's interest in the Hudson property. Illinois tenancy by the entirety law is therefore not an impediment to the Trustee's ability to sell the Hudson property.

Turning to the statutory conditions set forth in §363(h), only subsection (3) is at issue. Mrs. Schertz admitted in her answer and the parties' joint pretrial statement that subsections (1) and (2) have been met; she stipulated that partition was impracticable and that sale of the estate's interest alone would realize significantly less for the estate than a sale of the whole. There is also no dispute that subsection (4) does not apply; the property is not used for the production, distribution, or sale of electric energy or gas. The question then

is whether the Trustee has satisfied her initial burden of establishing that the sale would benefit the Debtor's estate, thereby shifting the burden to Kim Schertz to show why the sale should not be approved. 11 U.S.C. §363(h)(3); *Rhoads*, 572 B.R. at 912; *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 795 (Bankr. N.D. Ill. 2007).

The benefits to the estate of selling the Hudson property are clear. Claims filed in the Debtor's bankruptcy case total $3,515,568.99—comprised almost entirely of the debt owed to Compeer.[6] The Hudson property is the only major asset in the Debtor's bankruptcy estate, and the estate's interest is unencumbered. And, although the Trustee was not required to prove the value of the property, the evidence at trial was that the Hudson property is worth at least $736,000 and potentially more. As such, it appears the sale of the property would yield a significant dividend to estate creditors. *Phillips*, 379 B.R. at 796 (payment of a significant dividend to creditors is a substantial benefit to the estate) (citation omitted). The Hudson property cannot be abandoned or ignored by the Trustee. Having established such a significant benefit to the estate, the Trustee met her burden of proof on all issues. The burden then shifts to Kim Schertz to show why the sale should not be allowed to go forward.

---

[6] Compeer filed its claim for an amount in excess of $3.5 million. Testimony from Kevin Buente was that, after applying payments made by Schertz Aerial, the claim is now closer to $2.5 million. Since the trial in this proceeding, roughly $300,000 in cash held by Schertz Aerial that Compeer had a lien against has been turned over to Compeer, reducing the claim even further. An amended claim has yet to be filed, but the reduction in Compeer's claim does not change the analysis. It will receive the vast majority of any distribution made in the case.

### B. Kim Schertz's Defense

Mrs. Schertz's defense has been somewhat of a moving target. She claimed in her pretrial statement that the debt to Compeer was fully secured by business assets and would be paid in full by Schertz Aerial. She also said that a total refinance of the debt through the SBA was in process. Her position was that if Compeer was paid in full, it would withdraw its claim and the Trustee would be able to pay the small amount of administrative expenses and other claims filed in the Debtor's case from funds on hand without selling the Hudson property. But after almost a year, no refinancing through the SBA or any other lender has been proposed, and the possibility of a refinance was not even mentioned at the trial. Likewise, Mrs. Schertz made no claim that Compeer is fully secured by business assets. To the contrary, the pending plan of Schertz Aerial says that Compeer is undersecured.

Although Mrs. Schertz never amended her pretrial statement and filed no other documents raising any alternative defense, her attorney asserted at several pretrial hearings that Mrs. Schertz would likely be awarded 100% of the Hudson property in the pending dissolution of marriage, resulting in the estate having no interest in the property and the Trustee having nothing to sell. At trial, she advanced the argument that, even if the estate has an interest in the Hudson property, any benefit to the estate of a sale would be outweighed by the detriment she would experience from a sale. The Trustee made no objection to the raising of defenses not disclosed in the pretrial statement, and Mrs. Schertz was generally able to present all her evidence.

### 1. The Estate's Interest in the Hudson Property

Mrs. Schertz's primary defense to the Trustee's case is premised on her belief that, under a proper application of Illinois law in the pending dissolution of marriage case, the Hudson property would be awarded entirely to her. Indeed, her Exhibit 1 presented a listing of what she said were all of the couple's assets and purported to propose a 50/50 allocation of those assets between herself and the Debtor. Based on her Exhibit 1, Mrs. Schertz would get essentially everything—Schertz Aerial, the Hudson property, her IRA, several vehicles, several bank accounts, and other assets—plus an additional $600,000 payment from the Debtor. She claims the payment would be necessary to offset the Debtor's alleged dissipation of marital assets and expected future tax benefits from the NOL.

Under Illinois law, "marital property" is defined, subject to certain exceptions, as "all property, including debts and other obligations, acquired by either spouse subsequent to the marriage[.]" 750 ILCS 5/503(a). When a petition for dissolution is filed, each spouse is vested with a contingent property interest in all marital property, no matter how legal title to the property is held. 750 ILCS 5/503(e); *Reinbold v. Thorpe (In re Thorpe)*, 881 F.3d 536, 540 (7th Cir. 2018). "This contingent interest ripens into a full ownership interest for any property distributed to such spouse when the divorce court or the bankruptcy court enters an order of equitable distribution or final judgment." *In re Zachmann*, 2013 WL 1316647, at *2 (Bankr. N.D. Ill. Apr. 2, 2013) (citations omitted); *see also Thorpe*, 881 F.3d at 540. Section 503(d)

provides for the division of marital property "without regard to marital misconduct in just proportions considering all relevant factors[.]" 750 ILCS 5/503(d). "Just proportions" means that the allocation of marital property must be equitable but not necessarily equal. *In re Marriage of Morris*, 266 Ill. App. 3d 277, 281 (1994).

The relevant factors for determining an equitable allocation of marital property as set forth in the statute include:

> (1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including (i) any decrease attributable to an advance from the parties' marital estate under subsection (c-1)(2) of Section 501; (ii) the contribution of a spouse as a homemaker or to the family unit; and (iii) whether the contribution is after the commencement of a proceeding for dissolution of marriage or declaration of invalidity of marriage;

> (2) the dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions:

> > (i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;

> > (ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred;

> > (iii) a certificate or service of notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules;

> > (iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties.

750 ILCS 5/503(d). The standard for valuation of property for purposes of apportionment is that of fair market value as of the date of trial or such other time as agreed by the parties or ordered by the court. 750 ILCS 5/503(f), (k).

Mrs. Schertz's proposed allocation sets forth a list of assets and debts, ascribes a value to each, and apportions them between herself and the Debtor. Among the most substantive allocations, the proposal values the Hudson property at $736,000—the value as determined by Ms. Burns' initial report— and Schertz Aerial at a negative $1.3 million—using a simple calculation of

purported balance sheet values of assets less liabilities. Awarding both items to herself, along with her $285,000 Roth IRA, her checking accounts worth about $6000 total, the two Mercury vehicles valued at roughly $7000, and a few other small items, Mrs. Schertz concludes that such allocation would result in her being nearly $300,000 in the negative. Awarding the Debtor his NOL that she valued at $422,473, his alleged dissipation of the marital estate that she valued at $424,000, his various accounts worth roughly $45,000, the Jeep Compass at $11,000, life insurance policies at $20,000, and airline miles she valued at $20,000, Mrs. Schertz calculates the Debtor's allocation to be worth $922,579. The proposal then purports to balance the allocation by requiring the Debtor to offset the difference between his $900,000 portion and Mrs. Schertz's negative $300,000 portion with a $600,000 cash payment from him to her. There are obvious problems with this proposal; several of the most glaring problems will be discussed.

### i.    The Value of Schertz Aerial

No basis was provided for Mrs. Schertz's valuation of Schertz Aerial at a negative $1.3 million. Mrs. Schertz did not prepare and did not even claim to be familiar with the balance sheet about which she tried to testify. When the foundation for her testimony was challenged, Mrs. Schertz quickly admitted that she did not have any idea how to value the business. Her attorney moved on to discuss other assets and never went back to the issue of the value of Schertz Aerial. Mrs. Schertz's valuation of Schertz Aerial as set forth in her

proposal is not credible and cannot be relied upon. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶56 (a court's valuation of marital asset cannot be based on testimony that is not supported by a proper foundation).

At trial, the Court questioned whether balance sheet values are an indicator of fair market value. Illinois courts appear to be unsettled on the issue. *Compare Blackstone v. Blackstone*, 288 Ill. App. 3d 905, 913 (1997) (questioning the utility of "book value" as a measure of value of a business), *with In re Marriage of Brenner*, 235 Ill. App. 3d 840, 845 (1992) (although no precise rules govern, book value is an appropriate starting point to determine the value of closely-held corporation). This Court's view is that an unadjusted balance sheet provides little, if any, assistance in determining the fair market value of a business. Asset values on the Schertz Aerial balance sheet are clearly identified as being based on acquisition costs from which accumulated depreciation is then deducted. There is no presumption and there was no testimony that the acquisition cost of any asset of Schertz Aerial was at fair market value even at the time of acquisition. And there is no presumption and there was no testimony that accumulated depreciation calculated for tax purposes plays a role in determining fair market value.

Compounding matters, the Schertz Aerial balance sheet Mrs. Schertz relies on appears to be inaccurate on its face. The balance sheet, dated as of May 31, 2022—after the Schertz Aerial bankruptcy case was filed—lists among the company's assets property known through the course of proceedings before this Court as the "Gridley facility." But the Gridley facility was sold as part of

the standstill agreement with Compeer before the Schertz Aerial Chapter 11 petition was filed, the proceeds of which were used to pay down the debt owed to Compeer. Curiously, the balance sheet does reflect the debt reduction from the sale by listing the outstanding Compeer debt at $2.57 million despite still listing the Gridley facility as an asset. The Gridley facility was not listed as an asset in Schertz Aerial's bankruptcy schedules, and the Court sees no reason that it should be included on the post-petition company balance sheet. Absent testimony from a witness qualified to clarify or explain the discrepancy, the document lacks trustworthiness and should not have been relied upon by Mrs. Schertz and her attorneys.

Determining the value of a closely held corporation for purposes of allocating marital property in a dissolution "is an art, not a science, and the court must rely on expert witnesses . . . who may differ significantly in both methodology and valuation." *Liszka*, 2016 IL App (3d) 150238, ¶41 (citation omitted) (likening valuation of closely held corporation to valuation of professional corporation). There are several recognized methods of business valuation, and it is the role of the valuation expert to identify the proper methodology for a particular business as part of any opinion as to value. With no expert called, the Court cannot find that there is any evidence of the value of Schertz Aerial or that the balance sheet methodology suggested by Kim Schertz is even an appropriate valuation method for Schertz Aerial.

Because Mrs. Schertz could not establish any foundation for her testimony and she proffered no witness qualified to testify on the value of

Schertz Aerial, the Court cannot place any fair market value on the business. Mrs. Schertz paid the Trustee $20,000 for the stock and related claims only a year ago and testified that she believes she can turn the business around—indeed she believes the company is now operating in the positive and is hopeful about its reorganization. She obviously wants the business and believes that it has or will have value to her. Under the circumstances, valuing the business for purposes of marital allocation at a negative $1.3 million is not credible; that number cannot be used to support either an equal or an equitable allocation of marital property.

### ii.     The Value of the Debtor's NOL

Mrs. Schertz valued the future benefit to the Debtor of the NOL generated by Schertz Aerial at $422,000 and allocated that amount to the Debtor in her proposal. Because the NOL is only available to the Debtor, it must be allocated to him. It is, however, important to determine a realistic value of what the NOL may be worth to the Debtor. Mrs. Schertz's valuation is not realistic and not supported by her own evidence and expert witness.

Mrs. Schertz's tax expert, Nicole Allen, prepared a report suggesting that the NOL could be worth something within a range of $422,000 and $1.5 million over time. But Ms. Allen also admitted that the ranges were based on generic calculations and not tailored to any specifics related to the Debtor. She agreed that it would take several decades at a yearly income of $100,000 for the benefits to be fully realized, even at the low end of the range. Her calculation

was simply what might be recognized if a person with such a large NOL were able to work at a high enough income for enough years to use up the entire NOL.

Ms. Allen agreed that in order to more accurately determine the value of the NOL to the Debtor, she would need to make certain assumptions about his future earnings, the number of years he might continue to work, and what other income or deductions he might have in any particular year. With that information, she said, she could calculate more precisely a total potential value of the NOL to the Debtor. She acknowledged that to give an opinion on the current fair market value of the NOL to the Debtor, she would apply a discount rate to that total. Ms. Allen had not been asked by Mrs. Schertz to actually attempt to calculate and give an opinion on the fair market value of the NOL to the Debtor and, accordingly, gave no such opinion.

A threshold requirement of expert testimony is that it be both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (analyzing Rule 702); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (confirming that Rule 702 and the *Daubert* standard applies to all expert testimony). An expert's specialized knowledge and experience in a discipline goes to the reliability requirement and that expert's capacity for providing relevant testimony that will assist the trier of fact in resolving a pertinent issue. *Kumho*, 526 U.S. at 149 (citing *Daubert*, 509 U.S. at 590, 592). The Court found Ms. Allen to be credible and has no concerns about

her qualifications or reliability as an expert on accounting and tax principles. The issue is the relevance of her testimony in the context of this specific case.

To be relevant, the expert's testimony must be "sufficiently tied to the facts" of a particular "case." *Id.* at 150 (citing *Daubert*, 509 U.S. at 591). Mrs. Schertz offered no evidence of what the Debtor's future income might be and did not ask her expert to consider any such evidence in rendering her opinions. In the absence of evidence regarding any of the Debtor's specific circumstances and financial prospects, Ms. Allen's testimony, while helpful to understanding the mechanics of an NOL, did not aid the Court in determining the current fair market value of the NOL to the Debtor. Mrs. Schertz failed to present any credible evidence on the fair market value of the NOL for purposes of making an allocation of marital property.

### iii.   Dissipation

Mrs. Schertz claimed that the Debtor dissipated the marital estate and that $424,000 in dissipated assets should be allocated to him in the division of their marital estate. Dissipation occurs when a spouse uses marital property for their sole benefit, for a purpose unrelated to the marriage, while the marriage is undergoing an irreconcilable or irretrievable breakdown. *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶66 (citation omitted); *In re Marriage of O'Neill*, 138 Ill. 2d 487, 495 (1990). Importantly, the Illinois statute governing the issue conditions the availability of such a claim upon notice being given of a party's intent to claim dissipation that identifies the property

said to be dissipated, the period during which dissipation occurred, and when the marriage began undergoing an irretrievable breakdown. 750 ILCS 5/503(d)(2). Indeed, absent evidence of compliance with the express requirements of the statute, a claim of dissipation should not even be considered. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶¶76, 90. Mrs. Schertz may have filed a notice in her dissolution proceeding, but she did not offer a copy of any such notice into evidence at trial and presented no other evidence of the contents of such filing here. Thus, Mrs. Schertz failed to present the minimum evidence necessary for this Court to even consider the issue of dissipation.

The failure to present evidence on the issue is more than a technicality; without the required information, this Court is unable to determine whether the contents of any notice filed in state court comports not only with the specific requirements of the statute but also with Mrs. Schertz's claims of dissipation at trial here. *See, e.g., Hamilton*, 2019 IL App (5th) 170295, ¶90 (court could not consider dissipation of property not identified in notice of intent to claim dissipation). The statutory notice requirement is grounded in notions of fairness to the party charged with dissipation. *Id.* at ¶¶74-76. Absent evidence about the contents of the statutorily-required notice of intent filed in the dissolution proceeding, the Court cannot presume Mrs. Schertz has provided fair notice of her specific claims in this proceeding.

Further, raising a dissipation claim does not subject every expenditure made during a marriage to review and critique no matter how misguided the

spending; the claim must be specifically tied to the period during which the marriage was undergoing an irretrievable breakdown. *See O'Neill*, 138 Ill. 2d at 492-97. Mrs. Schertz presented no evidence regarding when the marriage was becoming irretrievably broken, and, without knowing the contents of any notice of intent, the Court is unable to determine when the marriage began undergoing an irretrievable breakdown and likewise unable to find whether the alleged dissipation occurred within the period contemplated by the statute. Where, as here, "the record does not contain evidence that clearly establishes the point at which the marriage began to break down, dissipation must be measured from the time the parties separated or a petition for dissolution is filed." *Hamilton*, 2019 IL App (5th) 170295, ¶86 (citations omitted). Mrs. Schertz filed her pending petition for dissolution on December 9, 2020, by which point it might be assumed the marriage was irretrievably broken. Because all the transfers alleged to be dissipation occurred before the filing of the pending dissolution, however, that date is not helpful to Mrs. Schertz's claim.[7]

An argument might be made that the marriage had begun to break down by the time the Debtor took a job away from home with ExpressJet Airlines in 2019 or at some point thereafter as his absences became longer and more frequent and his involvement in matters at home and with Schertz Aerial

---

[7] The Debtor and Mrs. Schertz both made passing reference in their testimony to a 2018 dissolution case filed by Mrs. Schertz. According to the Debtor, that case was dismissed voluntarily by Mrs. Schertz the same year. The Court heard no testimony on the specifics of the prior dissolution petition or its import here. But that apparent circumstance only raises further questions and highlights the importance of establishing when the marriage began undergoing an irretrievable breakdown.

diminished. But the Debtor had another reason for initially leaving home to take on outside employment: Schertz Aerial was struggling financially, and the Debtor needed to earn a living. And, according to Mrs. Schertz, the Debtor was away significant amounts of time throughout their marriage, so his leaving in 2019—or any time before or after—was apparently typical behavior. Every marriage is different, and not every conflict signals that a marriage is irretrievably broken. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶91. This Court will not presume that the Debtor's absence in 2019 or 2020 signaled that the couple's marriage was then becoming irretrievably broken.

Even were the Court able to determine that at some point before December 2020 the couple's marriage began its irretrievable breakdown, and that Mrs. Schertz had otherwise complied with the statutory notice requirements, the evidence presented suggests that most if not all the allegedly dissipated funds went into Schertz Aerial—a marital asset. Some of the transfers were between corporate accounts, which were not marital property but rather property of Schertz Aerial. Other transfers, even though from individual accounts in the Debtor's name that were marital property, were admittedly transferred to the marital asset, Schertz Aerial. As the Debtor said at trial, the money went "from one marital pot to another marital pot." Generally, transferring one marital asset to another marital asset, without more, will not constitute dissipation. *In re Marriage of Miller*, 342 Ill. App. 3d 988, 996 (2003) (citing *Hellwig v. Hellwig*, 100 Ill. App. 3d 452, 464 (1981)).

The Debtor's unrebutted testimony was that nearly every dollar transferred went directly to or was used for the benefit of Schertz Aerial. For the few transactions not independently justified as such by the documentary evidence or specifically admitted to by Mrs. Schertz, the Debtor asserted that each should be accounted for in the Schertz Aerial records in Mrs. Schertz's custody that he can no longer access.[8] Mrs. Schertz simply said that she does not know how or for what any of the money was used notwithstanding her own admissions and documentary evidence to the contrary. She further seemed to be in agreement with the Debtor about how the funds were used, citing loans he made to Schertz Aerial using personal assets to support her accusation that he drove up the company debts for sinister purposes. Her claimed ignorance, despite being the custodian of the corporate records the Debtor says would corroborate his testimony, was not credible.[9] Add to that fact Kim Schertz's failure to present evidence of her filing of the statutory notice of her intent to

---

[8] Generally, the party charged with dissipation must present clear and specific evidence to refute the charge and cannot merely state that the funds were used for proper purposes. *Hamilton*, 2019 IL App (5th) 170295, ¶87 (citation omitted). But courts recognize the impossibility of accounting for every penny of cash spent over a period of several years and therefore have found that such statements paired with documentary evidence confirming at least some of the expenditures and a broader explanation about the circumstances of the expenditures can suffice to refute a charge of dissipation. *Id.* Here, the evidence suggests that the transfers were part of a broader effort to fund Schertz Aerial's growth and operations. Whether the Debtor's testimony on the matter was credible is an issue that need not be reached because Mrs. Schertz did not present enough evidence to shift the burden to the Debtor. *Id.* at ¶90.

[9] Although lacking probative value here, the Court notes the Debtor's recently filed objection to Schertz Aerial's pending Chapter 11 plan to which he attached what he deemed to be relevant portions of a purported "consultant report" that identified shareholder contributions to the company between 2017 and 2018. Among those contributions totaling nearly $1.5 million was a $100,000 wire transfer from the Debtor to Schertz Aerial on September 24, 2018—the same date and amount of a transaction from the Debtor's Merrill Lynch IRA that Kim Schertz alleges was dissipation here. The Debtor previously sought to compel production of certain "consultant reports" in a separate proceeding brought by Kim Schertz against the Debtor to deny his discharge in bankruptcy (*Kimberly D. Schertz v. Robert Scott Schertz*, Adv. No. 21-07029). Whether the "consultant report" referenced in his objection in the corporate case is one of those that the Debtor sought to compel Kim Schertz to produce in her action against him is unclear; Mrs. Schertz voluntarily dismissed that proceeding before the matter was resolved. It suffices to say that the selective production of discoverable information depending on the needs of its proponent has been an issue throughout each of the related Schertz cases.

claim dissipation or any evidence of when the marriage was undergoing an irretrievable breakdown, the Court finds that she failed to make a *prima facie* case for dissipation. It will therefore not be considered here.

### iv.      Allocation of Other Assets

Having addressed the major assets and issues surrounding them, a few others deserve attention before reviewing Mrs. Schertz's proposed allocation. First, Mrs. Schertz allocated to the Debtor 1.7 million airline miles, assigning a value of $20,000. But she presented no evidence as to how that value was determined, and every indication is that the Debtor does not even want the miles. As the Debtor said, there would likely be a cost to use the miles. Second, the proposal did not include the $17,000 tractor that Mrs. Schertz and the Debtor agreed is marital property and is used on the Hudson property. It must be accounted for. Likewise, the Debtor testified that both he and Mrs. Schertz's names are on the title to the Ford Mustang that she listed as nonmarital. She did not rebut his testimony, and the asset should be included even if to be awarded to her. Finally, Mrs. Schertz admitted collecting and spending the $27,000 tax refund from the couple's 2019 jointly filed returns. It too must be included.

### v.      Mrs. Schertz's Proposed Allocation is Neither Equal nor Equitable

Mrs. Schertz's proposal skews in her favor by reason of her valuation of Schertz Aerial at a negative $1.3 million. That negative value, under her theory,

compels the allocation of virtually everything else of value to her to equalize the shares. But the proposal is neither equal nor equitable.

The purchase of the Debtor's stock in Schertz Aerial was voluntary on the part of Mrs. Schertz, and the transaction was approved by both this Court and the state court. She paid $20,000 for the stock and related claims only a year ago. Valuing the stock now at zero or, perhaps, $20,000 is likely fair and would provide a more equitable result. This is particularly true as Mrs. Schertz has no expert witness for valuation and apparently never intended to obtain such a witness; her attorney reported that discovery is closed in the dissolution case. Using an unadjusted balance sheet for valuation is simply not right, and her allocation based on the balance sheet figures is, again, just not credible.

Likewise, the valuation of the NOL at $422,000 on Mrs. Schertz's proposed allocation is wrong. She had her accountant figure a potential benefit for the NOL if the holder of the NOL worked long enough to use the NOL in its entirety. But she failed to have her accountant personalize the calculation to take into consideration reasonable assumptions based on the Debtor's age, health, and expected future earnings. And even the generic calculation was not discounted to present value—a step her accountant admitted would be necessary. Similarly, the allocation of $424,000 to the Debtor's side of the equation for dissipation is not appropriate. As explained above, Mrs. Schertz did not even make a *prima facie* case for that allocation.

If Mrs. Schertz's proposal is adjusted to remove the negative value for Schertz Aerial, the incorrect valuation of the NOL, and the unproven

dissipation claim, and she were still awarded the Hudson property and everything else she claims should be allocated to her, she would receive more than 90% of the marital estate. That is far from the equal split she said she was proposing. When the Court pointed out during arguments the problems with the asset valuations in Mrs. Schertz's proposed allocation and suggested that the result was not at all equal, her attorney pivoted to argue that the just apportionment of the marital estate requires that the division be equitable but not necessarily equal. But the proposal is also not equitable.

Mrs. Schertz is correct that fair and equitable division of marital property under the Illinois Marriage and Dissolution of Marriage Act does not require an equal division; one spouse may be awarded a larger share if the circumstances warrant such a result. *Romano*, 2012 IL App (2d) 091339, ¶121 (citation omitted). The statute only requires that the division be in "just proportions" upon consideration of all relevant factors. 750 ILCS 5/503(d). Only certain of the statutory factors are relevant here.

The Debtor and Mrs. Schertz have been married for 39 years. Both are 61 years of age and not especially optimistic about their own health or wage-earning prospects. Throughout the marriage, the Debtor was the sole wage earner while Mrs. Schertz cared for their home and children. The Debtor continues to work earning significant wages. And with years of high wage income behind him, the Debtor expects to receive meaningful Social Security income in retirement. Mrs. Schertz, on the other hand, is not nearly as employable as her husband. Having no job history and therefore no vocational

skills, her prospects for generating income for herself are certainly dimmer than those of the Debtor.

But Mrs. Schertz is in a much better position than the Debtor when it comes to the couple's IRAs and other retirement accounts. And, as the owner of Schertz Aerial, Mrs. Schertz at least has the potential to generate capital assets or income if the company successfully reorganizes—the pending plan in the Schertz Aerial bankruptcy suggests it will be profitable in the coming years. Mrs. Schertz is also currently receiving a minimum of $1000 a month in maintenance from the Debtor under a temporary maintenance order entered by the state court pending the couple's dissolution. She may be able to advocate for significantly more maintenance—she certainly believes she is entitled to as much—depending on the Debtor's income in the future and perhaps the anticipated benefit of his NOL. *See* 750 ILCS 5/504(a) (income, earning capacity, and tax consequences of the property division upon the respective economic circumstances of the parties among factors to consider when determining maintenance award).

In all, an equitable division resulting in as much as a 60/40 or even 65/35 split in favor of Mrs. Schertz might be fair and reasonable and might be the expected result of a state court trial. A more disparate division such as the 90/10 split she actually proposes seems unlikely, especially if Mrs. Schertz expects to also receive maintenance. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 660-63 (2008) (while awarding both maintenance and a disproportionate share of marital property is not prohibited, maintenance award must be

considered when equitably dividing marital property). Dividing the Hudson property 50/50 would leave the state court with the flexibility to still award an overall 60/40 split or something similar in Mrs. Schertz's favor. And if Mrs. Schertz is later able to meet her burden in the dissolution proceeding of establishing what she could not here—the value of the NOL or her dissipation claim for example—nothing would preclude the state court from awarding her an equalization payment to the extent necessary to attain an equitable distribution. *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶¶43-47 (whether to award lump sum or installment equalization payments is within the court's discretion). Mrs. Schertz makes no credible case that a 50/50 split of the Hudson property would be anything other than equitable; she has not made her case that the state court would likely award her the entire Hudson property.

### 2. Detriment to Kim Schertz of a Sale

Despite the obvious benefit to the estate, to determine whether that benefit outweighs any detriment to Mrs. Schertz, "the court must consider the economic and emotional detriment [she] would face." *Rhoads*, 572 B.R. at 913 (citation omitted). "Courts have defined 'detriment' as economic hardship, as well as any loss, harm, injury or prejudice resulting from the involuntary displacement." *Phillips*, 379 B.R. at 796 (citation omitted). Here, Mrs. Schertz stresses the fact that selling the Hudson property, where she raised her children and has lived for 30 years, would render her homeless. Again, she

described herself as basically unemployable, without means to generate meaningful income or acquire property in the future. She relies on the monthly maintenance payments she receives, as well as modest rental income from the farmland and state welfare benefits, but she acknowledged that her current income sources alone are not enough to cover her basic needs and the maintenance costs of the property.

The Court does not doubt the emotional attachment Mrs. Schertz has to the property. Nor does it take lightly the detriment to Mrs. Schertz in being forced to move out of her home and sell her interest in the property. But such could be said of any co-owner whose interest is to be sold under §363(h). Of course, Mrs. Schertz needs a place to live but not necessarily a house on 11 acres with another 52 acres of farmland that she cannot even afford to maintain on her current income. Compounding matters, her interest in the Hudson property is fully encumbered by Compeer's judgment lien. To avoid losing the property through foreclosure, Mrs. Schertz would have to refinance or sell her interest; her attorney admitted as much in closing arguments. In other words, Mrs. Schertz is likely to suffer economic hardship or displacement even if the property is not sold here. Allowing the sale through the Debtor's bankruptcy, free and clear of both of their interests, will yield the highest price and help reduce the significant debt owed to Compeer.[10] Thus, a sale would clearly benefit Mrs. Schertz even if she refuses to admit it. And although selling

---

[10] Compeer has agreed with the Trustee to cooperate in a sale of the property and to facilitate a closing of a sale transaction by the release of its lien on the property in exchange for the protection of its lien on the proceeds. An order memorializing their compromise was entered in the main bankruptcy case at docket #200.

the Hudson property would displace her from her current home, it would not make her homeless. She could likely rent or buy a more modest home at a lower cost than refinancing the entire property to pay Compeer.

Brief comment is also warranted as to Mrs. Schertz's contention that forcing a sale of the Hudson property would adversely impact the operations of Schertz Aerial and deprive her of much needed income sources. To the extent Mrs. Schertz contends that the ongoing operation of Schertz Aerial is dependent on the Hudson property, no such claim has been made by Schertz Aerial in its bankruptcy case. The company's pending Chapter 11 plan makes no mention of the Hudson property or it being necessary to its reorganization.[11] It has no interest in the property and, to the extent it has been using it for business purposes, it has not paid and apparently does not intend to pay for such use. As for other uses of the property that could serve as an income source, Mrs. Schertz's own testimony belies her assertion. She disputed the land's value for hunting and acknowledged that, even with increased rents under the current farm contract with Larry Troyer, the farmland generates just $14,000 annually—perhaps enough to cover property taxes and other maintenance costs but nowhere near enough to service the debt to Compeer were she able to refinance. To that end, Mrs. Schertz's attorney, again conceding that his client would have to refinance or otherwise come up with cash to essentially buy the property from Compeer in order to stay there,

---

[11] Schertz Aerial's proposed plan does account for a separate "Hudson facility" owned by the company. That property is wholly distinct from the Hudson property at issue in this proceeding. Any reference to the Hudson facility or property in the corporate case should not be confused with the property that the Trustee seeks to sell here.

suggested that she would deplete her IRA to subsidize the transaction. But that proposal makes little sense; depleting her only exempt asset that Compeer cannot reach and that is a crucial source of future income would result in as much if not more economic hardship as displacement from a sale here would cause. And the amounts in her IRAs are not even close to what she would need to satisfy Compeer.

In this proceeding, Mrs. Schertz initially took the position that Compeer is fully secured by the assets of Schertz Aerial and that the entire debt will be paid through a refinance with the SBA in the corporate case. But that position does not comport with what has occurred in the corporate case and directly contradicts the position Mrs. Schertz has taken there as president of Schertz Aerial. Compeer is not fully secured by the assets of Schertz Aerial, and the terms of the company's proposed plan of reorganization do not provide for full payment of Compeer's debt. There has also been no indication in the corporate case that Schertz Aerial has or expects to refinance with the SBA. Importantly, Compeer does not have to wait until Schertz Aerial's Chapter 11 plan is complete to pursue its lien on Mrs. Schertz's interest in the Hudson property.

Still, Mrs. Schertz takes the position that the interests of creditors should not be a consideration in determining each spouse's interest in the Hudson property under the Illinois Marriage and Dissolution of Marriage Act because the dissolution proceeding was commenced before the Debtor's bankruptcy case. But the fact that debt payment is the primary concern in bankruptcy does not preclude its consideration in resolving the dissolution

issues. Rather, the Illinois statute specifically identifies the liabilities of each spouse as a consideration in dividing marital property. 750 ILCS 5/503(d)(8). Indeed, Illinois law presumes that courts will allocate and divide marital property and debts to avoid the impairment of the rights of and obligations owed to third parties. *Kujawinski v. Kujawinski*, 71 Ill. 2d 563, 574 (1978); *see also Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 177-78 (Bankr. C.D. Ill. 2016) (citing *FirstMerit Bank v. McEnery*, 2014 IL App (3d) 130231-U, ¶39), *aff'd*, 569 B.R. 310 (C.D. Ill. 2017), *aff'd*, 881 F.3d 536 (7th Cir. 2018). Here, both Kim Schertz and the Debtor were liable on the Compeer debt. Compeer has a lien on whatever Kim Schertz's interest is in the Hudson property. And while the Debtor has received a discharge in his bankruptcy case, Compeer still is entitled to share in the proceeds from the liquidation of property interests of the estate. With Compeer having a direct interest in the Hudson property no matter how it is allocated, there is no reason that the debt to Compeer should not be considered here.

There appears to be no set of circumstances under which Mrs. Schertz could keep the Hudson property without having to pay Compeer the value of the property. She has not put forth any serious proposal or theory on how she might be able to keep the property and not pay Compeer. Both the Debtor and Mrs. Schertz contributed to the value of the Hudson property and both of their interests should be used to pay their mutual debt. Awarding the property entirely to Kim Schertz would, in essence, be to foreclose any meaningful contribution from the Debtor's bankruptcy estate in paying down the Compeer

debt while inviting a claim in the dissolution proceeding seeking contribution from the Debtor when Compeer predictably looks to enforce its lien against the property. The only sensible path forward is for the Trustee to sell the Hudson property and pay down the debt that the Debtor, Kim Schertz, and Schertz Aerial owe to Compeer. That is best accomplished by authorizing the sale and providing for a 50/50 split of the interests of each spouse.

## IV.   Conclusion

The Trustee met her burden of proof. She established that selling the Hudson property would yield a significant dividend to the creditors of the Debtor's bankruptcy estate. Absent selling the Hudson property free and clear of Kim Schertz's interest, Compeer and the other creditors of the Debtor would receive little from his bankruptcy estate. Kim Schertz and Schertz Aerial are also liable on the Compeer debt; blocking the Trustee's effort to sell the property and pay down that debt in the Debtor's bankruptcy would be detrimental to them.

Nevertheless, Kim Schertz has opposed the Trustee's effort through everchanging legal theories. While her defenses were somewhat plausible in the abstract, each was unsupported by the plainly established facts in the record or otherwise wholly undeveloped through evidence at trial. This was Mrs. Schertz's opportunity to show the Court why the sale of the Hudson property by the Trustee should not be allowed. But she failed to present any evidence to support her claims, and relief to the Trustee should not be delayed any further.

*See Hamilton*, 2019 IL App (5th) 170295, ¶45 (citations omitted) (parties should not be allowed to benefit on review from their failure to introduce evidence at trial). The Trustee will be allowed to proceed with selling the Hudson property free and clear of Kim Schertz's interest, which will be allocated at one half.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###